**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GUNSER VERDIER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DARBY BOROUGH, et al. | : | NO. 10-377 |

## MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Baylson, J.**                                                                              **June 20, 2011**

**I.      Introduction**

This action arises out of the detention of Plaintiff Gunser Verdier during a misfortunate

meal break at night on January 31, 2008, by police officers of Darby Borough, Pennsylvania.

Plaintiff filed this action for money damages pursuant to 42 U.S.C. § 1983, the Fourth and

Fourteenth Amendments of the United States Constitution, and Pennsylvania common law,

against Defendants Darby Borough, Officer Claude Simpkins ("Simpkins"), Officer Pete Ray

("Ray"), Officer Brian Evans ("Evans"), and Detective Brian Pitts ("Pitts").[1]  In his Complaint

filed January 28, 2010 (ECF No. 1), Plaintiff asserted claims against Darby Borough for illegal

seizure (Count I) and illegal search (Count II), both of which Plaintiff has since agreed to

dismiss.[2]  Plaintiff also raised claims against Simpkins, Ray, Evans, and Pitts (collectively,

"Defendants" or "the Officers") for deprivation of Plaintiff's constitutional rights under the

---

[1] Plaintiff previously filed an action arising out of the same events against Darby
Borough, Chief of Police Robert F. Smythe, and police officer John Doe on November 20, 2008,
Civ. A. No. 08-5472, before the Honorable Gene Pratter.  Plaintiff's complaint in that action was
dismissed without prejudice on July 13, 2009.

[2] Letter from Defs.' Counsel, Dec. 20, 2010.

Fourth and Fourteenth Amendments (Count III), including his right to be secure in his person and property, his right to be free from excessive use of force, and his procedural and substantive due process rights. Plaintiff also set forth a claim against Pitts for supervisory liability (Count IV), which he has withdrawn.[3] Finally, Plaintiff brought common law claims against all of the Officers for assault (Count V) and battery (Count VI), and a claim against Simpkins, Evans, and Pitts for false imprisonment (Count VII).

Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 19) and Revised Memorandum of Law (ECF No. 20) on the remaining four counts, Counts III, V, VI, and VI. Following a careful review of the record, and viewing the evidence in the light most favorable to Plaintiff, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment. Specifically, the Court will grant the motion for summary judgment as to all claims against Simpkins and Pitts. The Court will deny the motion for summary judgment as to the excessive force (Count III), assault (Count V), and battery (Count VI) claims against Evans, and grant the motion as to all other claims against Evans. The Court will deny the motion for summary judgment as to the claim for unlawful search of Plaintiff's car against Ray (Count III), and grant the motion as to all other claims against Ray.

## II.    Factual and Procedural History

The Court sets forth the events giving rise to this action in light of its obligation under Fed. R. Civ. P. 56 to consider the facts in the light most favorable to Plaintiff. The Court also provides the Officers' accounts to the extent they raise additional relevant facts and genuine disputes of material fact that prevent resolution of the claims at the summary judgment stage.

---

[3]  Letter from Pltf.'s Counsel, May 23, 2011.

2

### A.    Plaintiff's Account

On the evening of January 31, 2008, Plaintiff Gunser Verdier was working as a fleet service agent for US Airways at the Philadelphia airport.  Verdier Dep. 9:17-10:17; 21:14-18, Aug. 5, 2010 (Ex. D-4).[4]  During his lunch break, Plaintiff drove to Pizza Paradise on Wycombe Avenue in Yeadon and bought a sandwich.  Id. at 21:24-22:21.  Plaintiff pulled over on the 1300 block of Wycombe Avenue, approximately half a mile to a mile from Pizza Paradise, to eat his sandwich before returning to work at the airport.  Id. at 22:22-23:12.  Plaintiff sat alone in his blue '94 Honda Civic, eating his sandwich, at approximately 9:30 p.m.  Id. at 21:14-18; 23:13-18.

Around that time, Officer Simpkins pulled up in a marked SUV behind Plaintiff's vehicle, approached Plaintiff's car on the driver's side, and asked for Plaintiff's license and registration.  Id. at 23:19-24:9. [5]  Plaintiff asked two or three times, "what did I do," and Simpkins persisted in requesting the identification.  Id. at 23:19-24:17.  Simpkins, who is black, was the only officer on the scene at that time.  Id. at 24:16-25.  Plaintiff gave Simpkins his driver's license and reached above the visor to get his registration and insurance.  Id. at 25:2-15.  Simpkins shined his flashlight into the car and asked about the badge hanging around the rearview mirror.  Id. at 25:2-15.  Plaintiff had a badge on a metal strand from Plaintiff's previous job as a security guard for Leonard Security Company, which Plaintiff had bought at a uniform

---

[4] Plaintiff also submitted with his brief a signed statement dated February 21, 2008 regarding the January 31, 2008 incident, which is consistent with his deposition testimony.  Pl.'s Ex. 4.

[5] Plaintiff could not identify Simpkins by name but said he was a black officer whom he would recognize.  Verdier Dep. 36:2-25.  The only officer whom Plaintiff identified by name at his deposition was Detective Pitts.  Id. at 37:2-25.

equipment store at his employer's recommendation.  Id. at 13:5-14:23; 18:25-19:22.  Plaintiff told Simpkins that he was a certified security officer and showed the police officer his Act 235 card, which identified Plaintiff as a security guard with lethal weapons training (the "identification card").  Id. at 13:5-10; 15:20-16:5; 25:16-22.

Simpkins told Plaintiff to put his hands on the car window, and Plaintiff put his hands on the window or door.  Id. at 26:12-27:8.  Other officers arrived on the scene, an officer opened the car door, and Plaintiff was dragged out of the car and placed against the vehicle near the rear wheel.  Id. at 27:9-28:6.  Plaintiff was on his feet, laying against the car with his forehand and his hands on the car.  Id. at 28:7-29:9.  Plaintiff did not know who removed him from the car and could not turn to see who placed him against the car, but thought only one officer did so.  Id. at 29:10-17; 30:12-22.  Plaintiff was asked if he had a gun, to which he responded that he had a gun at home.  Id. at 30:23-31:10.  An officer patted down Plaintiff, taking his wallet and putting it on top of the car roof, and taking items like change from his pockets and putting them on the ground.  Id. at 31:17-32:10.  The officers took Plaintiff from the car with force, shook him hard and held him down against the car for five or ten minutes.  Id. at 32:14-33:14.  Plaintiff heard somebody playing with "some type of metal" and the officers saying that if Plaintiff made a move, "you can do anything you want to him."  Id. at 32:21-33:5; 34:12-35:12.  Plaintiff was not facing the officers and never saw anyone with a gun, baton or Taser.  Id. at 35:13-25.  One officer, who was white, searched "all over" Plaintiff's car.  Id. at 30:23-31:10.

Detective Pitts, the last officer to talk to Plaintiff, did not touch Plaintiff.  Id. at 37:2-18.

Pitts took Plaintiff's badge and identification card.  Id. at 37:19-25.[6]  Plaintiff was told that the police were taking his badge and identification card and that if he "obtained employment in the security field, [he] should come to them with confirmation of [his] employment in order for them to return" the property.  Pl.'s Statement at 2.  Sometime after the incident, Plaintiff and his attorney went to the Darby Borough Police Department to retrieve his badge and identification card.  Id. at 39:24-40:13.  Lieutenant Guy informed them that the police were investigating and they could not return the property.  Id. at 40:25-41:14.  In June 2008, the badge and identification card were returned after Plaintiff's attorney contacted the police department.  Id. at 39:21-42:18.

Between February 19, 2008 and July 15, 2008, Plaintiff was treated for nightmares relating to his detention.  Id. at 45:23-48:21.  Plaintiff has not had nightmares since concluding treatment in July 2008.  Id. at 48:22-25.

B.     **The Officers' Account**s

1.   *Officer Simpkins*

Prior to his encounter with Plaintiff, Simpkins was sitting in his vehicle at the cross street of Wycombe Avenue and MacDade Boulevard, near a gas station and a Chinese store, when a man and a woman knocked on his car window.  Simpkins Dep. 6:22-24; 8:6-9:16, Dec. 17, 2010 (Ex. to Defs.' Revised Mem. of Law).  The two individuals told Simpkins that they were uncomfortable and concerned because a black male was sitting in a dark-colored, small vehicle in

---

[6] The badge has a "Commonwealth of Pennsylvania" seal in its center and numbers on the bottom of the badge.  Photocopy of badge (Ex. D-1).  The numbers and the writing on the top of the badge are illegible in the photograph.  The identification card says "Commonwealth of Pennsylvania CERTIFIED AGENT Lethal Weapons Training Act Certification F Certification Number 31516."  Photocopy of identification (Ex. D-2).  The identification card also shows Plaintiff's photograph, name, date of birth, the certification date, and the expiration date.

the middle of Wycombe Avenue in front of their residence for several hours, and was speaking to passersby. Id. at 6:11-7:11; 9:7-24; 29:6-30:7. Simpkins did not know the two individuals. Id. at 29:6-30:7. Simpkins drove down Wycombe Avenue, pulled behind the vehicle in question, and observed an African-American male eating a sandwich in the driver's seat of the parked car, and a badge hanging from the rear view mirror. Id. at 10:12-11:8. Simpkins did not observe the driver speaking to anyone or using any surveillance equipment. Id. at 12:2-10. Plaintiff was in a residential neighborhood where vehicles regularly parked on the street. Id. at 27:24-28:7.

Simpkins double-parked, because there were no spots behind Plaintiff, activated his safety siren, went to Plaintiff's driver's side window and asked for identification, and Plaintiff rolled down his window. Id. at 12:25-13:23. Simpkins observed a male in the car wearing an airport jumpsuit, a sandwich and maybe a beverage on the passenger seat, and a badge hanging from the rearview mirror, on which Simpkins could see numbers. Id. at 13:24-14:10; 15:17-24. Simpkins asked Plaintiff why he was sitting there and if he lived in the area, to which Plaintiff responded that he was eating his sandwich and he lived around the corner. Id. at 14:21-15:7; 27:12-23. Simpkins further testified that Plaintiff told him he was a police officer at the airport, and that Plaintiff said he was sitting in his car for an hour or two. Id. at 20:11-23; 26:4-19.

Simpkins testified that other officers arrived and talked to Plaintiff but there was a communication barrier when Evans asked him to exit the vehicle. Id. at 18:3-19:9. Plaintiff refused to exit, and Evans removed Plaintiff from the car. Id. at 18:14-19:17. Simpkins testified he may have used his flashlight to see inside the vehicle. Id. at 22:12-16. Simpkins said he believed the vehicle was searched by Officer Evans, but he could not recall if the entire vehicle was searched. Id. at 23:23-24:9. Simpkins had no contact with Plaintiff once Plaintiff was

removed from the vehicle.  Id. at 28:15-18.[7]

2. *Officer Evans*

Evans responded to a radio call and was the second officer to arrive at the scene, where he saw Simpkins and a person seated in a vehicle, with a badge similar to a Philadelphia Police badge hanging from the rearview mirror.  Evans Dep. 7:7-8:9; 11:16-21, Nov. 15, 2010 (Ex. D-6).  Evans testified that the person seated in the parked vehicle was suspicious because he was observing people and a resident had complained, and because there was a badge in his window, which could indicate a subject impersonating a police officer.  Id. at 8:10-10:22.  Evans observed Simpkins requesting Plaintiff's license, registration and insurance, and Plaintiff not responding.  Id. at 13:7-15.  Evans requested that Plaintiff exit the vehicle two times, and Plaintiff refused.  Id. at 13:23-14:16.  Evans then opened the door, put Plaintiff's left hand on his left shoulder, removed him from the vehicle, escorted him to the front of the vehicle, and advised him to put his hands on the hood.  Id. at 14:17-15:15.  Evans conducted a patdown of Plaintiff for weapons and found none.  Id. at 15:16-16:11.  Plaintiff turned back around facing the officers while they checked for outstanding warrants.  Id. at 16:12-20.  Evans had no further contact with Plaintiff.  Id. at 15:18-23.

Evans further testified that after Plaintiff produced his Act 235 card, a plain view search of the interior of the car, including the driver's side, passenger side, and rear, was conducted.  Id. at 18:9-19:18.  Evans did not enter the car nor did he know if another Officer did so.  Id. at 19:19-20:4.

3. *Officer Ray*

---

[7] Simpkins prepared a police report about the incident (Ex. D-3).

Ray was the third officer to arrive on the scene, where he saw Plaintiff standing outside of his car with Simpkins and Evans. Ray Dep., 7:12-22, Nov. 15, 2010 (Ex. D-5). After Evans advised Ray of what was happening, Evans called Pitts to investigate the badge. Id. at 8:2-9:3. Ray neither had physical contact with Plaintiff nor saw another Officer have physical contact with Plaintiff. Id. at 9:19-24. Ray neither searched the vehicle nor saw another Officer search the vehicle. Id. at 10:14-19.

### 4. *Detective Pitts*

Pitts responded to a call to assist on a vehicle stop and arrived to see Ray, Simpkins, and Evans talking to Plaintiff outside of Plaintiff's vehicle. Pitts Dep. 3:22-4:19, Dec. 17, 2010 (Ex. to Defs.' Revised Mem. of Law). Pitts was the highest-ranking Officer of the four Defendants. Id. at 7:9-12. Pitts was not a supervisor of the patrol unit. Id. at 7:4-8. Pitts testified that Simpkins asked him if they should seize the badge, and Pitts agreed. Id. at 7:15-22. Three weeks after the incident, Pitts told Lieutenant Guy, who was investigating the incident, that the police received no information regarding anyone impersonating a police officer by using Plaintiff's badge, and there was no reason to hold the badge. Id. at 17:22-18:8.

### C. Procedural History

Defendants filed their Motion for Summary Judgment (ECF No. 19) on December 22, 2010, and revised Memorandum of Law (ECF No. 20) on December 29, 2010. Plaintiff filed his Response in Opposition on January 24, 2011 (ECF No. 23). The Court held oral argument on the motion on May 16, 2011. At oral argument, Plaintiff's counsel clarified that all claims against the individual officers were brought in their individual capacity; that Officer Evans asked Plaintiff to get out of the car and forcibly removed Plaintiff from the car; and that Officer Ray

searched the car. The Court invited Plaintiff to send a letter clarifying any of his claims in light of oral argument. Plaintiff withdrew Count IV in his counsel's letter dated May 23, 2011.

## III.    The Parties' Contentions

### A.    Defendants' Contentions

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims. Defendants contend that the Officers did not use unreasonable force against Plaintiff. The only Defendant who used any degree of force was Evans, whose removal of Plaintiff from the vehicle was reasonable in light of the circumstances. Furthermore, Plaintiff's assault and battery claims should be dismissed in light of Plaintiff's statements that no officer threatened Plaintiff, the only touching of Plaintiff was his removal from the vehicle, and Plaintiff suffered no physical injury.

Defendants contend that the stop and fourteen-minute detention of Plaintiff was lawful because they visually searched Plaintiff's car, and confiscated Plaintiff's badge and identification card pending investigation. The Officers contend they lawfully detained Plaintiff on a "Terry stop" and removed Plaintiff from the vehicle after observing the security badge. Defendants also argue that Plaintiff cannot establish a due process claim because his specific claims arise under the Fourth Amendment. Lastly, the Officers argue that even if Plaintiff's constitutional rights were violated, they are entitled to qualified immunity as a matter of law with respect to all federal claims.

### B.    Plaintiff's Contentions

First, Plaintiff contends that Officer Simpkins did not have the requisite reasonable suspicion to detain Plaintiff, based on an anonymous tip that did not report criminal activity, was

not particularized, and did not predict future conduct.[8]

Second, Plaintiff contends that the Officers did not have reason to believe their safety was in danger to justify conducting a limited search for weapons. Plaintiff contends that the search was improper because it was based on general suspicion and the search exceeded the proper scope because Officer Evans searched inside his pockets.

Third, Plaintiff contends that there is a factual dispute as to the type of search conducted of his car. Plaintiff contends that the police lacked probable cause to search the car based on their observations of Plaintiff and the badge hanging in his mirror, which was not illegal activity.

Fourth, Plaintiff contends that the police were unreasonable when they forcibly removed him from the car, slammed him against the car, and officers said they could do anything to him that they wanted. Plaintiff was not engaging in criminal activity, posed no threat, and cooperated with Officer Simpkins.

Fifth, Plaintiff contends that because his detention was unlawful, Officer Evans is liable for assault and battery, and all of the Officers are liable for false imprisonment.[9]

Sixth, Plaintiff contends that the government officers are not entitled to qualified immunity because they violated clearly established rights of citizens under the Fourth

---

[8] Several of Plaintiff's contentions in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment refer to violations of Article I, Section 8 of the Pennsylvania Constitution in addition to the Fourth Amendment of the United States Constitution. However, Plaintiff's Complaint did not raise claims pursuant to the Pennsylvania Constitution. Therefore, the Court will not analyze arguments pertaining to the Pennsylvania Constitution on summary judgment.

[9] This contention is contrary to Plaintiff's Complaint, which pled the assault and battery claims against all Officers, and the false imprisonment claim against Officers Simpkins, Evans, and Pitts.

Amendment.[10]

## IV. Legal Standards

### A. Jurisdiction

The Court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff alleges

causes of action pursuant to 42 U.S.C. § 1983 and the United States Constitution. The Court also

has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. §

1367. Venue is proper under 28 U.S.C. § 1391(b).

### B. Standard of Review

A district court should grant a motion for summary judgment if the movant can show

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a).[11] A dispute is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of

---

[10] In his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Plaintiff does not raise specific contentions pertaining to his due process claim regarding the taking of his badge and his identification card.

[11] Because this civil action was pending when the Amendments to the Federal Rules Of Civil Procedure became effective on December 1, 2010, the Court references the amended summary judgment standard in Fed. R. Civ. P. 56(a), which substitutes "genuine dispute" for "genuine issue," the phrase in former subdivision (c). The Rules Advisory Committee explained that the 2010 Amendments do not affect the substantive standard for summary judgment or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56 Advisory Committee's Note. Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order, the amended rule governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable." United States Courts, Rules and Forms in Effect: Rules and Forms Amendments Effective 12/1/10, http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110.aspx (last visited Apr. 5, 2011).

the suit under the governing law."  Id.

Where the nonmoving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249 (internal citations omitted).  Under Rule 56, the Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of the nonmovant.  Id. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

V.      **Discussion**

A.      **Count III: Constitutional Claims**

42 U.S.C. § 1983 provides a remedy for the violation of an individual's constitutional or federal rights by someone acting under color of state law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002).[12]  The plaintiff bears the burden of proof to establish that the defendant violated his

---

[12]  42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. ...

rights.  Edwards v. City of Philadelphia, 860 F.2d 568, 572 (3d Cir. 1988) (citing Wing v.

Britton, 748 F.2d 494, 497 (8th Cir. 1984)).  Because an individual defendant must have

"personal involvement in the alleged wrongs" to be liable under Section 1983, the district court

must examine each cause of action as to each defendant against whom it is alleged.  See Rode v.

Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).

The Fourth Amendment protects the rights to be free from unlawful search, unlawful

seizure, and the use of excessive force.  U.S. Const. amend. IV (providing, in relevant part, that

the "right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated. . .").  To succeed on a Fourth

Amendment claim, a plaintiff must show that the defendant's actions constituted a "search" or

"seizure" within the meaning of the Fourth Amendment and were "unreasonable" under the

circumstances.  Brower v. County of Inyo, 489 U.S. 593, 599 (1989).  Because the Fourth

Amendment governs Plaintiff's claims regarding search, seizure, and excessive use of force, "the

more generalized notion of 'substantive due process'" under the Fourteenth Amendment does not

apply.  See Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S.

386, 395 (1989)).

The facts of this case involve five phases at which a constitutional claim potentially arose

under the Fourth Amendment:

1) Simpkins approached Plaintiff's car and asked Plaintiff for identification;

2) Simpkins ordered Plaintiff to place his hands on the window or door of the car;

3) Evans ordered Plaintiff out of the car;

4) Evans physically removed Plaintiff from the car and searched him; and

5) Evans or Ray searched Plaintiff's car.

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law. . . ." U.S. Const. amend. XIV. The Fourteenth Amendment governs Plaintiff's procedural due process claim, which accrued when:

6) Pitts seized Plaintiff's badge and identification card.[13]

The Court examines each of these six alleged constitutional violations.

1.    *Simpkins Approached Plaintiff's Car and Asked Plaintiff for Identification*

A seizure is a restraint of movement by either physical force or a show of authority. United States v. Mendenhall, 446 U.S. 544, 553 (1980). Generally, a search or seizure not pursuant to a warrant is presumptively unreasonable. Groh v. Ramirez, 540 U.S. 551, 559 (2004). An initially consensual interaction becomes a seizure "when a reasonable person would no longer 'feel free to decline the officers' requests or otherwise terminate the encounter.'" Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003) (quoting Florida v. Bostick, 501 U.S. 429, 436 (1991)). A seizure begins with "either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)) (seizure began when, in response to officer's

_____

[13] In a Section 1983 action, a party may raise three categories of due process claims under the Fourteenth Amendment: 1) claims incorporating "specific protections defined in the Bill of Rights"; 2) substantive due process claims "bar[ring] certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them"; and 3) procedural due process claims concerning the absence of procedural remedies where an individual is "depriv[ed] by state action of a constitutionally protected interest in life, liberty, or property." Zinermon v. Burch, 494 U.S. 113, 125 (1990) (internal citations and quotation marks omitted). Plaintiff's allegations regarding the taking of his badge and identification card implicate this third category of procedural due process.

demand that the suspect submit to a pat-down, the suspect submitted to the show of authority by turning to the police car and placing his hands on the car); United States v. Brown, 334 F.3d 1161, 1163 (D.C. Cir. 2003) (investigative stop began not when officer knocked on car window, but rather when officer opened the car door).  The "objective" test for a "show of authority" is "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." Hodari D., 499 U.S. at 628.  When an individual refuses to submit to a show of authority, or momentarily complies and then refuses to submit, no seizure has occurred.  See United States v. Valentine, 232 F.3d 350, 353, 359 (3d Cir. 2000) (defendant did not submit to show of authority when, in response to officers' demand that he place his hands on his car, defendant stopped, told the officers his name, and fled).

In United States v. Williams, 413 F.3d 347 (3d Cir. 2005), four police officers in their marked police cruiser were patrolling a residential neighborhood when they observed a parked van with its rear doors open, and the defendant inside the rear of the van.  Id. at 349.  The officers admitted they did not suspect that the defendant was engaged in criminal activity when they approached the van.  Id.  The Third Circuit held that the police officers did not initiate a seizure by approaching the van, because the officers did not make a show of authority or use force as they exited their marked police cruiser and walked up to the van.  Id. at 352.  Therefore, the officers' approach of the defendant's vehicle did not implicate the Fourth Amendment.  Id.  See also United States v. Maynard, 152 F. App'x 191, 194 (3d Cir. 2005) (non-precedential) ("[A]n officer is permitted to approach a car parked on a public street" without initiating a seizure.).  By contrast, in Couden v. Duffy, 446 F.3d 483 (3d Cir. 2006), a police officer who did not declare

himself to be an officer or show a badge, who drew his gun while approaching the defendant's vehicle, made a show of force that was a seizure under the Fourth Amendment.  Id. at 494.

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  United States v. Drayton, 536 U.S. 194, 200 (2002) (citing Florida v. Royer, 460 U.S. 491, 497 (1983)).  In Drayton, police officers boarded a bus and asked passengers questions "in a polite, quiet voice," "did not brandish a weapon," and "left the aisle free."  Id. at 203-04.  The Supreme Court found that the officer's conduct "gave the passengers no reason to believe that they were required to answer the officers' questions."  Id. at 203.  Noting that "[i]t is beyond question that had this encounter occurred on the street, it would be constitutional," the Court held that "[t]he fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure."  Id. at 204 (citing Bostick, 501 U.S. at 439-40).

In United States v. Smith, 575 F.3d 308 (3d Cir. 2009), cert. denied, 130 S. Ct. 771 (2009), a police officer in a marked vehicle on routine patrol of a high-crime area leaned out of the car window and asked Smith, whom he observed walking down the street, "Can I talk to you for a second?"  Id. at 311.  Smith stopped walking and turned toward the police car, and the officer asked if Smith had identification, to which Smith replied he did not.  Id.  The officer asked where Smith was going, and Smith responded "to my girl's house."  Id.  The officer asked where the house was multiple times and each time Smith said he was heading to his girl's house.  Id.  The Third Circuit held that the officer who approached Smith and asked him questions did not make a show of authority and thus did not seize Smith.  Id. at 314.  The officer was

permitted to ask Smith the same question multiple times because Smith's responses were nonsensical and "not clearly a refusal to consensually engage." Id.

The Third Circuit distinguished Smith from Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003), in which an officer, acting on a tip from a hotel employee about a suspicious individual, asked an occupant of a van parked in a hotel parking lot to roll down the window, requested identification, and advised the occupant that he "was being detained." Id. at 202-03. The Third Circuit found that encounter became a seizure when the officer refused to accept Johnson's choice not to answer his questions and persisted in questioning him, making "it clear that Johnson was not free to ignore him and would not be left alone until he complied." Id. at 206 (reversing the district court's denial of summary judgment as a matter of law on the claim that the investigative stop violated Johnson's constitutional rights, because Johnson was seized and the evidence did not support an objectively reasonable suspicion for the seizure). Whereas the officer in Johnson made a show of authority by advising the van occupant that he was being detained, the officer in Smith did not make clear that Smith was not free to leave by stopping Smith and asking him questions on the street. Smith, 575 F.3d at 314 (citing Johnson, 332 F.3d at 206).

Here, Simpkins's initial encounter with Plaintiff was analogous to the police interactions in Smith and Williams rather than Johnson. Simpkins was in a police vehicle, on routine patrol, when two individuals told him that a man was sitting in a car for several hours on Wycombe Avenue in a residential neighborhood.[14] Simpkins Dep. 6:11-9:24. Simpkins went to Wycombe

_____

[14] In certain circumstances, a sufficiently corroborated tip by an anonymous "informant" may contribute to an officer's development of reasonable suspicion. See Alabama v. White, 496 U.S. 325, 328-31 (1990). Plaintiff argues that the two neighborhood residents who approached

Avenue to investigate and saw Plaintiff sitting in a parked car. Id. at 10:12-11:8. Simpkins did

not have to believe that Plaintiff was engaged in criminal activity in order to approach lawfully

and ask Plaintiff questions. See Williams, 413 F.3d at 351-52. As in Williams, Simpkins did not

make a show of authority or use force when he approached Plaintiff. Although Simpkins pulled

up behind or next to Plaintiff's car with the safety siren activated,[15] this did not raise the initial

encounter to a seizure, because the activation of the siren did not result in Plaintiff's submission.

Simpkins Dep. 13:9-23; Pl.'s Dep. 23:19-24:9. Cf. Brendlin v. California, 551 U.S. 249, 262

(2007) (when police pull over a moving vehicle in a traffic stop, a passenger "may submit to

authority by not getting up to run away").

Here, Simpkins was not pursuing or pulling Plaintiff over when he arrived on Wycombe

Street, but rather stopped to ask Plaintiff questions on a public street. See Smith, 575 F.3d at

311; Williams, 413 F.3d at 352. The fact that Plaintiff was sitting in his parked car rather than

standing on the street at the time of the encounter does not alter the analysis. See Drayton, 536

U.S. at 204 (officers boarding a bus to ask passengers questions, rather than asking individuals

questions on the street, did not elevate an otherwise constitutional encounter into a seizure);

Maynard, 152 F. App'x at 194 (officer may approach car parked on public street). Unlike

_____

Simpkins were unreliable informants who did not report witnessing criminal activity that would
contribute to the officer's reasonable suspicion. Pl.'s Mem. of Law Pt. 2 (Doc. No. 23-2).
However, the Court finds that Simpkins' approach of Plaintiff's car did not implicate the Fourth
Amendment, and thus Simpkins did not need reasonable suspicion to approach Plaintiff and ask
him questions. Therefore, the Court need not analyze whether the neighbors were reliable
"informants."

[15] The record is not clear if a "safety siren" includes a loud siren noise or only consists of
flashing lights. Simpkins testified as follows: ". . . [Plaintiff] was rolling the window down
because I put my lights on so. Q. So you had activated your safety siren? A. That's correct.
Because I was double-parked in the middle of the street." Simpkins Dep. 12:23-13:3.

Johnson, 332 F.3d at 206, Simpkins did not notify Plaintiff that he was being detained when Simpkins first approached the car, or otherwise act in a manner signaling that Plaintiff was not free to get out of his car and walk away.

Furthermore, as in Smith, Simpkins was permitted to ask Plaintiff for identification multiple times, because Plaintiff, by his own admission, gave a nonresponsive answer, "what did I do?" two or three times.  Pl.'s Dep. 23:19-24:17.  Plaintiff's answer was not a clear refusal to answer the officer's question.  See Smith, 575 F.3d at 314.   Viewing the circumstances in the light most favorable to Plaintiff, Simpkins did not display force or make a show of authority that would signal that Plaintiff was not free to leave or to refuse to answer Simpkins's questions when he approached Plaintiff and asked for identification.

2.      *Simpkins Ordered Plaintiff to Place His Hands on the Interior of the Car*

Whereas Simpkins asking Plaintiff to identify himself did not implicate the Fourth Amendment, ordering Plaintiff to place his hands on the vehicle was a show of authority that would make it clear to a reasonable person that he was not free to leave.  In United States v. Brown, 448 F.3d 239 (3d Cir. 2006), the Third Circuit found that the officer's seizure of the defendant began when the officer told Brown that he was a suspect for a robbery, ordered him to place his hands on the police car, and "Brown turned to face the police car and placed his hands on the vehicle in response."  Id. at 245-46.  The officer's instruction in Brown amounted to a "show of authority," with which the defendant initially complied.  Id. at 246.  Cf. Smith, 575 F.3d at 311 (no seizure occurred when the police officer asked defendant to put his hands on the hood of the police car, and defendant took two steps towards the police car before fleeing).  See also Gentry v. Sevier, 597 F.3d 838, 844-45 (7th Cir. 2010) (seizure began "[w]hen the officers

pulled up in their patrol car and one officer exited the car and told Gentry to 'keep his hands up,'" because a reasonable person "would not believe that he was free to leave); United States v. Pajari, 715 F.2d 1378, 1381 (8th Cir. 1983) ("we conclude that there was no 'seizure' or 'stop' until Pajari was ordered to raise his hands and leave his car"); United States v. Freeman, 713 F. Supp. 1236, 1238 (N.D. Ill. 1989) ("the relevant time for our Fourth Amendment inquiry is at the point of seizure which the court finds to be when Officer Epperson demanded the defendants to place their hands on the trunk of their car"). According to Plaintiff's testimony, here, as in Brown, Simpkins told Plaintiff to put his hands on the car window, and Plaintiff submitted to this show of authority by putting his hands on the window or door. Pl.'s Dep. at 26:12-27:8. This conduct constituted a seizure under the Fourth Amendment.

Having determined when Plaintiff was seized, the Court turns to whether the seizure was lawful. An investigative stop or "Terry stop" is an exception to the warrant requirement for a lawful seizure. In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," the officer may make "reasonable inquiries" to investigate the behavior. Id. at 30. Furthermore, if the initial encounter does not dispel the officer's reasonable fear for the safety of himself and others, the officer may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id. Officers are "authorized to take such steps as [a]re reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry] stop." United States v. Hensley, 469 U.S. 221, 235 (1985). For example, in the context of

a traffic stop, police officers may order an occupant to put his hands in the air if they have reasonable suspicion that the passenger compartment may contain a concealed weapon. United States v. Moorefield, 111 F.3d 10, 13 (3d Cir. 1997).[16] The reasonableness of the protective measures an officer takes depend "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).

Reasonable suspicion is determined by the totality of the circumstances and requires that the officer "articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 27); Ybarra v. Illinois, 444 U.S. 85, 93 (1979) (finding an absence of reasonable suspicion where "the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous"). Conduct that is lawful in some contexts but appears "ambiguous" may give rise to reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (citing Terry, 392 U.S. at 30) (holding that officers had reasonable suspicion to stop a man in an area known for heavy narcotics trafficking who was carrying an opaque bag and fled immediately upon seeing them); see also United States v. Goodrich, 450 F.3d 552, 562, 564-65 (3d Cir. 2006) (holding that Terry stop was justified where officers observed an individual sitting in a parked car "in the proximity of a recently perpetrated offense," in a high crime area, around midnight). An observation that someone looks "suspicious" is an inadequate basis for reasonable suspicion for a Terry stop. Brown v. Texas, 443 U.S. 47, 49

---

[16] Traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in Terry." Berkemer v. McCarty, 468 U.S. 420, 439, n.29 (1984).

(1979).

The facts of this case, taken in the light most favorable to Plaintiff, are that after Plaintiff gave Simpkins his driver's license, Simpkins inquired about the badge hanging on the rearview mirror of Plaintiff's car. Pl.'s Dep. 25:2-15. Plaintiff told Simpkins that he was a certified security officer, and showed the police officer his security guard identification card, which stated that Plaintiff had lethal weapons training. Id. at 13:5-10; 15:20-16:5; 25:16-22. The badge resembled a police badge. Ex. D-1; Evans Dep. 7:7-8:9; 11:16-21. Simpkins's observation of the badge, in addition to his observation of Plaintiff sitting in a parked car at night in a residential neighborhood, gave rise to Simpkins's reasonable suspicion that criminal activity might be afoot. Knowing that Plaintiff had lethal weapons training, Simpkins was entitled to take steps to protect his personal safety and maintain the status quo during the remainder of his interaction with Plaintiff by asking Plaintiff to put his hands on the door. See Brown, 448 F.3d at 246. These specific, articulable facts are more than a mere "hunch" that Plaintiff looked suspicious and justify Simpkins's seizure of Plaintiff under Terry. Asking Plaintiff to put his hands on the interior of the car was a minimally intrusive step for the Officer's safety. See Moorefield, 111 F.3d at 13. In the alternative, Simpkins is entitled to qualified immunity, as will be discussed in Part V. B.

   3.      *Evans Ordered Plaintiff to Exit the Car*

Officers may take reasonable steps to avoid unnecessary risks in the course of a Terry stop. Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (citing Terry, 392 U.S. at 23). The Supreme Court has "specifically recognized the inordinate risk confronting an officer as he

approaches a person seated in an automobile." Id.   In Mimms, the Supreme Court held that an

officer may order an individual to exit a vehicle during a lawful traffic stop, even in

circumstances where the "officer had no reason to suspect foul play from the particular driver at

the time of the stop."  Id. at 109.  The "precautionary measure" was justified because the

"additional intrusion can only be described as de minimis," and a "a mere inconvenience cannot

prevail when balanced against legitimate concerns for the officer's safety."  Id. at 110-11

(reversing the state supreme court's judgment overturning the defendant's conviction on Fourth

Amendment grounds).

Plaintiff testified that after he complied with Simpkins's order to put his hands on the

interior of the car, the door was opened and Plaintiff was removed from the vehicle.  Pl.'s Dep.

27:9-28:6.  Plaintiff's testimony was that he did not know who removed him from the car, but his

brief assumes that Evans removed him from the car.  Pl.'s Dep. 29:10-17.  According to

Simpkins and Evans, Evans requested that Plaintiff exit the vehicle two times, and Plaintiff

refused.  Simpkins Dep. 18:3-19:17; Evans Dep. 13:23-14:16.  Assuming Evans ordered Plaintiff

to exit the vehicle, this was an additional minimal intrusion justified to protect the Officers'

safety.

4.     *Evans Removed Plaintiff From the Car and Searched Plaintiff*

a.     *Excessive Force*

A law enforcement officer violates the Fourth Amendment by using excessive force

against an individual in the course of a seizure.  Graham v. Connor, 490 U.S. 386, 394 (1989).

Police officers' use of force is evaluated on whether their actions were "'objectively reasonable'

in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (citing Scott v. United States, 436 U.S. 128, 137-39 (1978)).

The Third Circuit has identified several factors to consider in determining whether an officer's use of force is objectively reasonable. These factors include "whether the suspect poses an immediate threat to the safety of the officers or others," "whether he actively is resisting arrest or attempting to evade arrest by flight," "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Kopec v. Tate, 361 F.3d 772, 776-77 (3d Cir. 2004) (citations omitted). Physical injury is not a necessary factor for an excessive force claim, but rather an additional factor to consider. Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds as recognized in Curley v. Klem, 499 F.3d 199, 209 (3d Cir. 2007)) (citing Gumz v. Morrissette, 772 F.2d 1395, 1400-01 (7th Cir. 1985), abrogated on other grounds by Lester v. City of Chicago, 830 F.2d 706 (7th Cir. 1987)).[17] The inquiry should further consider "the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir.

---

[17] In the Eighth Amendment context, the Supreme Court held that a plaintiff need not allege "some arbitrary quantity of injury" to state an excessive force claim. Wilkins v. Gaddy, 130 S. Ct. 1175, 1179 (2010); see also Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002) (in context of Eighth Amendment excessive force claim, whether injury was de minimis is a question of fact for the jury, rather than a question of law for the court). This district has applied Smith v. Mensinger to an alleged Fourth Amendment violation. Hammock v. Borough of Upper Darby, No. 06-CV-1006, 2007 WL 3232115, at *5 n.11 (E.D. Pa. Oct. 31, 2007) (Davis, J.) (alteration in original) (quoting Smith, 293 F.3d at 631) (explaining that the holding of Smith v. Mensinger was even "more applicable outside the prison context where 'the obvious security concerns inside the [prison's] close confines' are not at issue").

1995) (quoting Graham, 490 U.S. at 397). An officer's specific threat to cause harm may, under the totality of the circumstances, contribute to an excessive force claim. Black v. Stephens, 662 F.2d 181, 188-89 (3d Cir. 1981) (affirming jury verdict on excessive use of force claim where officer in plainclothes drew his gun and threatened to shoot plaintiff and his wife in the context of an investigatory stop).

Generally, the reasonableness of force under the Fourth Amendment is a question for the jury. Estate of Smith v. Marasco, 318 F.3d 497, 515-16 (3d Cir. 2003). Summary judgment is not appropriate on an excessive force claim if there are material disputes of fact and unresolved credibility determinations. Groman, 47 F.3d at 634 (reversing the district court's grant of summary judgment on plaintiffs' excessive force claim against several officers). If the facts taken in the light most favorable to the plaintiff suggest that an officer applied force against a cooperative individual, the jury should resolve the question of fact whether the use of force was reasonable. See Hayhurst v. Upper Makefield Twp., Civ. A. No. 06-3114, 2007 WL 1795682, at *6 (E.D. Pa. June 20, 2007) (McLaughlin, J.) (where plaintiff's factual account suggested she was trying to comply with the officers, the reasonableness of the officers' use of handcuffs was a question for the jury). If the plaintiff's version of the facts is unreliable and uncorroborated, however, the court may grant summary judgment to defendant police officers on an excessive force claim. Brown v. Borough of Chambersburg, 903 F.2d 274, 277-78 (3d Cir. 1990) (affirming summary judgment for officers where the plaintiff's account of events was supported only by his own testimony, which was compromised by "his drunken condition and his admitted inability to remember" and contradicted by disinterested witnesses).

Here, Plaintiff testified that one of the Officers dragged him out of the vehicle and

slammed him against the car. Pl.'s Dep. 27:9-28:6. Plaintiff could not see which Officer removed him or held him down. Id. at 29:10-17; 30:12-22. In his briefing and at oral argument, Plaintiff framed the excessive force claim against Evans only. See Pl.'s Mem. of Law (ECF No. 23-1) ("Police Officer Brian Evans forcibly removed Mr. Verdier from his car and slammed him against the car door while plaintiff offered no resistence [sic]. Did the officer commit excessive force on Mr. Verdier?"). Simpkins and Evans testified that Evans removed Plaintiff from the car. Simpkins Dep. 18:3-19:17; Evans Dep. 14:17-15:15. However, Plaintiff testified he was forcefully dragged out of his vehicle, slammed against the vehicle, held down, and shook up. Pl.'s Dep. 28:7-29:9; 32:14-33:14; Pl.'s Statement at 1. There are no circumstances calling into question the reliability of Plaintiff's testimony, nor are there disinterested witnesses to support either side, unlike Borough of Chambersburg, 903 F.2d at 277-78. Thus, there is a genuine dispute of material fact remains as to what level of force Evans used in removing Plaintiff from the car, and whether the amount of force he used was reasonable. The disputes of fact and related credibility determinations are questions for the jury.

     b.    *Terry Frisk*

An officer may also perform a pat-down of a suspect's outer clothes to protect the safety of himself and others. Terry, 392 U.S. at 30; Adams v. Williams, 407 U.S. 143, 146 (1972) (explaining that the purpose of a Terry frisk is "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence"). A frisk is lawful if the investigative stop itself is lawful, and "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 784 (2009). Under the "plain feel" doctrine, a police officer may exceed the scope of a Terry

pat-down search for weapons if, during the course of the pat-down of a suspect's clothing, the officer feels an item that is identifiable as contraband. Minnesota v. Dickerson, 508 U.S. 366, 373 (1993).

There is a material dispute of fact as to whether the frisk conducted by Evans exceeded the permissible scope of a Terry frisk. Plaintiff has alleged that the Officer who searched him went into his pockets and removed items including loose change, whereas Evans testified that Plaintiff was patted down for weapons. Pl.'s Dep. 31:17-32:10; Evans Dep.15:16-16:11. If the jury credits Plaintiff's testimony, the search would not be lawful under the "plain feel" doctrine, because there is no evidence that Evans felt any identifiable contraband in the course of the pat-down to justify a further search inside Plaintiff's pockets. Therefore, the motion for summary judgment is denied as to Plaintiff's constitutional claims against Evans for excessive use of force and unlawful search of Plaintiff's person.

       5.     *Evans or Ray Searched Plaintiff's Car*

The Fourth Amendment protects against unreasonable searches as well as unreasonable seizures. An officer must have probable cause to perform a lawful warrantless search of a car. California v. Acevedo, 500 U.S. 565, 569-70 (1991). Probable cause to conduct a search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996) (citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949); Illinois v. Gates, 462 U.S. 213, 238 (1983)). The Supreme Court has held that several sets of circumstances in which police have probable cause that a vehicle contains evidence of a crime

are lawful exceptions to the warrant requirement, including exigency that the vehicle will be moved, California v. Carney, 471 U.S. 386, 390 (1985) (citations omitted), and search "incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 129 S. Ct. 1710, 1723 (2009).

In Michigan v. Long, 463 U.S. 1032 (1983), the Supreme Court held that to facilitate officer safety in a "roadside encounter," an officer may search the passenger compartment of an automobile, "limited to those areas in which a weapon may be placed or hidden," if the officer has "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer to believe that the suspect is dangerous and the suspect may gain immediate control of weapons." Id. at 1049 (citing Terry, 392 U.S. at 21). This objective analysis is similar to the reasonable suspicion requirement for lawful search and seizure of a person, requiring the court to consider "'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Id. at 1050 (quoting Terry, 392 U.S. at 27). An officer may seize contraband other than weapons discovered while conducting a legitimate Terry search of a vehicle's interior. Id. at 1050-51 (holding that at a late hour, in a rural area, where the defendant appeared intoxicated, and the officers observed a large knife in the car, frisking the suspect and conducting a limited search of the areas inside the car to which the suspect could gain immediate control was justified).

Police officers may also seize evidence of a crime without a warrant pursuant to the "plain view" doctrine, whether the discovery of such evidence is inadvertent or deliberate.

Horton v. California, 496 U.S. 128, 130 (1990). Seizure of an object in plain view is permissible only if (1) the "object's incriminating character must be 'immediately apparent,'" and (2) the officer has "a lawful right of access to the object itself." Id. at 128-29 (citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)). An officer may use a flashlight in conducting a plain view search. United States v. Rickus, 737 F.2d 360, 367 n.3 (3d Cir.1984).

Here, it is undisputed that the Officers did not have a warrant to search Plaintiff's car. The only applicable exception to the warrant requirement is the Officers' reasonable belief that Plaintiff was dangerous and had immediate access to weapons. See Long, 463 U.S. at 1049-50. Taking the evidence in the light most favorable to the Plaintiff, a reasonable jury could find that Plaintiff, once he had been removed from the car and frisked, did not pose a threat to the Officers' safety and did not have immediate access to weapons.

Critically, there is a material dispute of fact as to what type of search of the car occurred. Plaintiff testified that one of the white Officers searched "all over" his car. Pl.'s Dep. 30:23-31:10. At oral argument, Plaintiff focused his claim regarding the search of his car on Ray. However, Ray testified that he did not search the car. Ray Dep. 10:14-19. Evans testified he did a plain view search. Evans Dep. 18:9-19:18. These questions of fact and credibility determinations are for the jury to decide. The motion for summary judgment on Plaintiff's claim for unlawful search of his car is denied, as to Evans and Ray.

6.    _Pitts's Seizure of Plaintiff's Badge and Identification Card_

There are two elements of a Section 1983 claim for deprivation of procedural due process. See Chambers ex rel. Chambers v. School Dist. of Philadelphia Bd of Educ., 587 F.3d

176, 194 (3d Cir. 2009). The plaintiff must establish that "'(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide due process of law.'" Id. (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006)). The state "typically" should afford an individual a pre-deprivation hearing. Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008) (citing Fuentes v. Shevin, 407 U.S. 67, 81 (1972)). However, "in special circumstances, a state may satisfy the requirements of procedural due process merely by making available 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.'" Id. (quoting Parratt v. Taylor, 451 U.S. 527, 539 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)). The Court considers available procedures to remedy erroneous deprivations, including state statutory and common law tort remedies. Revell v. Port Auth. of N.Y., N.J., 598 F.3d 128, 138 (3d Cir. 2010), cert. denied, 131 S. Ct. 995 (2011) (citing Zinermon v. Burch, 494 U.S. 113, 126 (1990)) (affirming summary judgment for the defendant on plaintiff's due process claim where plaintiff did not allege that New Jersey's state procedures to recover wrongfully seized property were insufficient or why plaintiff was entitled to special notice of the procedures).

Here, Plaintiff has not even stated a claim for procedural due process, much less can he recover. The Complaint, filed January 28, 2010, alleged that "Plaintiff's property including his badge and identification were never returned to him," but did not allege what processes were available under state law to recover his property, whether he availed himself of those processes, and whether those procedures were inadequate. Compl. ¶ 20.

More importantly, Plaintiff testified that he retrieved the badge and identification card

from the police in June 2008.  Pl.'s Dep. 39:21-42:18.  Because Plaintiff recovered his property before filing the case, he does not have a constitutional injury.  Article III requires that there be an "actual controversy" at all stages of review.  <u>Alvarez v. Smith</u>, 130 S. Ct. 576, 580 (2009) (quoting <u>Preiser v. Newkirk</u>, 422 U.S. 395, 401 (1975)) (holding that case was moot where state returned to plaintiffs the property that was the subject of their due process claim while the suit was pending).  Summary judgment is granted to Pitts on the due process claim.

### B.       Qualified Immunity on Constitutional Claims

The Defendants assert that even if they violated Plaintiff's constitutional rights under the Fourth or Fourteenth Amendments, they are entitled to qualified immunity.  Qualified immunity is a shield for "government officials performing discretionary functions" against "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982) (citations omitted).  A clearly established right is one that a reasonable official would understand his actions had violated under the pre-existing law.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).  The doctrine of qualified immunity "'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'"  <u>Hubbard v. Taylor</u>, 538 F.3d 229, 236 (3d Cir. 2008) (quoting <u>Gilles v. Davis</u>, 427 F.3d 197, 203 (3d Cir. 2005)).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court set forth a two-part test to determine whether the defense of qualified immunity applies, requiring an initial inquiry into whether the "facts alleged show the officer's conduct violated a constitutional right," followed by

a determination "whether the right was clearly established." Id. at 201. In Pearson v. Callahan, 129 S. Ct. 808 (2009), the Supreme Court reconsidered Saucier and held that a district court in its "sound discretion" may address either prong first. Id. at 818.

On a motion for summary judgment asserting the defense of qualified immunity, the plaintiff bears the initial burden to show that the defendant's conduct violated the plaintiff's clearly established right. Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (citations omitted). If the plaintiff meets that burden, the burden shifts to the defendant to establish "that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions." Id. (citing Albright v. Rodriguez, 51 F.3d 1531, 1534-35 (10th Cir. 1995)).

Determining the issue of qualified immunity is appropriate "where the dispute does not turn upon 'which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of "clearly established" law.'" Reilly v. City of Atlantic City, 532 F.3d 216, 234 (3d Cir. 2008) (citing Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005)). However, where the "the facts are intensely disputed, [Third Circuit] precedent makes clear that such disputes must be resolved by a jury after a trial." Curley v. Klem, 499 F.3d 199, 208 (3d Cir. 2007) (citations omitted). After the jury has resolved the relevant factual issues, "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." Id. at 211 (citing Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004)).

　　1.　　*Simpkins*

-32-

In addition to finding that summary judgment is appropriate on the constitutional claim against Simpkins for illegal seizure, the Court finds that in the alternative, Simpkins is entitled to qualified immunity. Under the first Saucier/Pearson inquiry, the court asks whether the "facts alleged show the officer's conduct violated a constitutional right." As discussed, the "dual" inquiry under Terry is "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20. Simpkins had a specific, articulable suspicion that criminal activity was afoot based on his observation of the badge resembling a police badge in Plaintiff's car. There is no precedent to suggest that Simpkins did not have reasonable suspicion for a stop based on those grounds. To the contrary, in Devenpeck v. Alford, 543 U.S. 146 (2004), the Supreme Court held that the defendant could be lawfully arrested based on probable cause that the defendant was impersonating a police officer even though it was not "closely related" to the offense which the officers stated was the basis for the arrest. Id. at 156 (remanding for the Ninth Circuit to determine whether the officers had probable cause to arrest the defendant on those grounds). The Supreme Court assumed but did not discuss the legality of "the initial stop of respondent[, which] was motivated entirely by the suspicion that he was impersonating a police officer." Id. at 155.

Furthermore, Simpkins was entitled to take measures to ensure his personal safety as he conducted the remainder of the Terry stop, particularly in light of the fact that Plaintiff was carrying an identification card identifying him as a guard with "lethal weapons training." See Moorefield, 111 F.3d at 13 (police may lawfully order occupant of car to put his hands in the air to protect the officer's safety during a stop). Therefore, Simpkins is entitled to qualified

immunity for his actions.

2.    *Evans and Ray*

In the preceding sections, the Court reviewed several genuine disputes of material fact in this case.  Given the unresolved questions of fact as to claims of excessive use of force and unlawful search of Plaintiff's car, it would be premature for the Court to determine whether a reasonable officer would believe he was following clearly established law under the circumstances.  Therefore, on the present record, the Court will not grant summary judgment to Evans and Ray on Plaintiff's surviving constitutional claims under Count III based on the doctrine of qualified immunity.

**C.    State Law Claims**

1.    *Counts V and VI: Assault and Battery*

Plaintiff also alleges assault and battery claims under Pennsylvania common law. "'Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person.'"  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (quoting Cohen v. Lit Brothers, 70 A.2d 419, 421 (Pa. Super. Ct. 1950)).  In Renk, the court explained that whether an "officer's conduct constitutes an assault and battery" is dependent on "the reasonableness of the force used."  Id.

Although Plaintiff pleads assault and battery against all four Officers, Plaintiff narrowed the claim in his opposition brief and at oral argument to the actions of Officer Evans.  See Pl.'s Mem. at 2.  As discussed above, there is a material dispute of fact as to how much force Officer

Evans used against Plaintiff and whether that force was reasonable. Therefore, the Court denies summary judgment as to Evans on Counts V and VI. Plaintiff has not alleged that Simpkins, Ray, or Pitts attempted to injure Plaintiff's person. Summary judgment is granted to Simpkins, Ray, and Pitts on Counts V and VI.

      2.     *Count VII: False Imprisonment*

Finally, Plaintiff alleges a common law claim for false imprisonment against Simpkins, Evans, and Pitts. "The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention." Renk, 641 A.2d at 293. If an officer has probable cause to arrest an individual, then the detention is not unlawful and the officer is not liable for false imprisonment, "regardless of whether the individual arrested was guilty or not." Id. (citing Fagan v. Pittsburgh Terminal Coal Corp., 149 A. 159 (1930)). The court cannot grant summary judgment for defendants on a false imprisonment claim if "the lawfulness of the detention remains an issue" for trial. Avery v. Mitchell, No. Civ. A. 98-2487, 1999 WL 240339, at *11 (E.D. Pa. Apr. 20, 1999) (Kelly, J.) (holding that state law claim for false imprisonment survived defendants' summary judgment motion where there were disputes of fact as to the lawfulness of plaintiffs' detention).

Here, the lawfulness of Plaintiff's detention is not in dispute. For the reasons discussed above, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Simpkins had probable cause to initiate a Terry stop. Therefore, Plaintiff's detention was not unlawful. Summary judgment is granted to Simpkins, Evans, and Pitts on Count VII.

**VI.     Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. The case will proceed to trial on Plaintiff's constitutional claims against Evans and Ray and the assault and battery claims against Evans. An appropriate Order follows.

O:\CIVIL 09-10\10-377 Verdier v. Darby Borough\MSJ Mem.wpd